UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONVERGE, INC.,

       Plaintiff,                       CASE NO. 06-CV-15247

-vs-                                    PAUL D. BORMAN
                                         UNITED STATES DISTRICT JUDGE

TOPY AMERICA, INC.,

       Defendant.
_____/

**OPINION AND ORDER**
**(1) GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND**
**(2) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court are cross-motions for summary judgment. Plaintiff Converge, Inc. ("Plaintiff") filed its Motion for Summary Judgment on July 12, 2007. (Doc. No. 20). Defendant Topy America, Inc. ("Defendant") filed its Motion for Summary Judgment on July 16, 2007. (Doc. No. 23). Both parties filed Responses. The Court held a motion hearing on September 19, 2007. Having considered the entire record, and for the reasons that follow, the Court GRANTS Plaintiff's motion, and DENIES Defendant's motion.

**I. BACKGROUND**

The instant case arises out of Plaintiff's allegations that Defendant has breached a settlement agreement reached by the parties on March 9, 2006. Plaintiff and Defendant differ sharply over the meaning of a central phrase in the parties' settlement agreement.

The background facts of the underlying lawsuit in this case are recounted by a previous Order of this Court:

Plaintiff, Converge, Inc. ("Plaintiff"), is a Michigan corporation with its principal offices in Madison Heights, Michigan. Defendant, Topy Corporation ("Defendant"), located in Frankfort, Kentucky, manufactures steel and aluminum wheels for the automotive industry. Plaintiff is a manufacturer's representative company which procures contracts with automobile manufacturers for companies such as Defendant.

On June 5, 1998, Defendant entered into a Consulting Agreement with Plaintiff. The Agreement called for Plaintiff to be paid $4,000.00 per month for its services in both advising Defendant and assisting Defendant's marketing efforts. Paragraph 1 of the Agreement states:

> 1. *Compensation.* During the term of the Consulting Agreement, the Company shall pay the Consultant four thousand ($4,000.00) dollars per month beginning on the date of this Consulting Agreement. However, in the event that this Consulting Agreement is terminated prior to the end of any such one month period, such fee shall be prorated on a per diem basis and the Consultant will refund to the Manufacturer all amounts applicable to the period following the effective date of termination. The Consultant will not be responsible for all expenses incurred by the Consultant in performing services under the Consulting Agreement and will not be entitled to be reimbursed by the Manufacturer for expenses of any type. While it is intended that the foregoing will constitute the sole and exclusive receipts by Consultant with respect to services rendered under this Consulting Agreement or otherwise by Consultant or Manufacturer, if Manufacturer enters into a contract with Chrysler during the term of this Consulting Agreement to supply Chrysler with Manufacturer's products (as a result of contacts made by Consultant with Manufacturer's prior consent) Manufacturer will enter into an agreement with Consultant to pay Consultant a fee in such amount as Manufacturer and Consultant agree.

On February 1, 2000, the parties executed an addendum to include Ford Motor Company as well as Chrysler under this compensation provision. Defendant subsequently entered into sales contracts with both Chrysler and Ford Motor Company. Plaintiff and Defendant did not enter into an agreement to pay Plaintiff a fee with regard to its supply contracts between Defendant and Ford and Chrysler.

On June 16, 2004, Plaintiff filed its Complaint, alleging breach of contract, estoppel, and *quantum meruit.* Plaintiff filed its Motion for Partial Summary Judgment on July 26, 2005. Defendant filed its Motion for Summary Judgment on July 28, 2005.

The bolded portion of Paragraph 1 represents the center of the dispute between the parties. Defendant asserts that the $4,000 monthly stipend for consulting is all that Defendant owes or has ever owed to Plaintiff. Plaintiff counters that the second portion of the agreement recognizes that Plaintiff will be owed additional

compensation should its sales solicitation endeavors with Ford and Chrysler result in a contract between those automakers and Defendant.

*Converge, Inc. v. Topy Corp.*, No. 04-72235, 2005 WL 3434799, *1-2 (E.D. Mich. Dec. 14, 2005) (unpublished) (internal citations omitted).

On December 14, 2005, the Court entered an Order dismissing Plaintiff's breach of contract claims, but holding that the quantum meruit and estoppel claims could proceed. *Id*. at *4-6.

On March 8 and 9, 2006, Judge Robert H. Cleland assisted the parties in brokering a settlement agreement in the underlying case. (Compl. ¶ 7, Ex. 1, Settlement Memorandum). Judge Cleland produced a settlement memorandum embodying the terms of the settlement: The relevant terms for the purposes of the instant case include:

1. The case is dismissed with prejudice with each party to bear its own costs and expenses.

2. Written mutual releases of all claims related to the issues in this suit will be drafted and executed in good faith by the parties.

3. Defendant will pay Plaintiff a commission of *one percent (1%) of gross sales* on the sales of certain wheels during a certain time period as follows:

    a. The time period begins in 2003 at the inception of the Defendant's provision of wheels to Ford (FMC) and Daimler Chrysler (DCX).

    b. The time period ends at the beginning of model change-over during 2010, expected to occur on or about on or about July 1.

. . . .

    e. As to both FMC and DCX wheels:

. . . .

        I. *The gross sales price upon which the commission is calculated shall be measured by the price of the "base steel wheel" sold.* The

3

> sale price is not to be affected by enhancement items that are supplied or applied by a [Defendant] subcontractor with the cost of such enhancements essentially passed through by [Defendant] to FMC or DCX.
>
> . . . .
>
> 5. Defendant shall pay the "past due" one percent commissions on FMC and DCX sales from 2003 inception to the date of the agreement within ninety days, that is by June 9, 2006.
>
> . . . .
>
> 9. This agreement supercedes all earlier commission agreements or arrangements between the parties.

(*Id.*) (emphases added).

Since the parties had indicated that they had reached a settlement of the case, this Court entered an Order of Dismissal in the case on March 31, 2006. Neither party objected to Judge Cleland's Settlement Memorandum.

The parties subsequently attempted to memorialize the settlement agreement in writing. (Compl. ¶ 12). On May 9, 2006, Defendant's counsel sent by email to Plaintiff's counsel a proposed written settlement agreement and the mutual releases. (Def. Br. Ex. 3, May 9, 2006 Email). Plaintiff's counsel responded by letter on June 5, 2006, attaching proposed revisions to the draft settlement. (Def. Br. Ex. 5, June 5, 2006 Email).

On June 6, 2006, Defendant paid to Plaintiff a lump sum "past due" 1% commissions, as required by ¶ 5 of the settlement memo.

On June 21, 2005, Defendant's counsel attached a further revision of the draft settlement agreement. (Def. Br. Ex. 6, June 21, 2006 Email).

Despite this back-and-forth communication concerning a writing settlement agreement,

4

the parties could not formalize their agreement in writing. Plaintiff contends that the effort to obtain a written settlement agreement and release was stymied by its discovery of Defendant's breach of the agreement. (Compl. ¶ 12).

The crux of the parties' instant dispute is the meaning of the phrase "the gross sales price upon which the commission is calculated shall be measured by the price of the 'base steel wheel' sold."

The parties state that in 2004 and 2005, there was a general market increase in the price of steel. (Def. Br. Ex. 4, Gonda Dep. 8). As a result of these price increases, Defendant was required to seek compensation from its customers DCX and Ford. (*Id*. at 8-9). DCX agreed to pay the increased cost, and incorporated the increased the steel cost into the contract price for the base steel wheel. (Def. Br. Ex. 12, Carbaugh Dep. 12).

Defendant initially requested that Ford include the steel price increase into the price of the contract. (*Id*. at 48-49). However, Ford decided to compensate Defendant for the increased price of steel through a lump sum payment in the form of a 1% surcharge, rather than increase the contract price. (*Id*.). In June 2007, Ford subsequently agreed to include the increased price of steel into the contract price, retroactive to January 1, 2007. (*Id*. at 37).[1]

Both parties were aware of the steel surcharge issue at the time of the settlement negotiations and agreement. (Gonda Dep. 9-10).

Plaintiff has taken the position that its commission on the "gross sales price" of the "base steel wheel" in the settlement agreement should include the 1% steel surcharge paid by Ford, in

---

[1] As a result, the parties have agreed that the only commission payments in dispute in the instant case concern Ford's steel surcharges from the years 2005 and 2006.

addition to the contract price. On the other hand, Defendant contends that the 1% steel surcharge is not part of the "gross sales price" of the "base steel wheel."

Plaintiff filed suit in federal district court on November 27, 2006, alleging that Defendant has breached the settlement agreement by not paying the 1% commission on the steel surcharge amount. Plaintiff asserts two Counts: Count I: Breach of Contract; and Count II: Violation of the Michigan Sales Representative Commissions Act ("MSRCA").

Plaintiff has calculated that it is entitled to $60,303.78 in commissions for the years 2005 and 2006. In relief, Plaintiff requests that this Court order an accounting, order Defendant pay the 1% commissions contained in the agreement, and declare that the "gross sales" include steel purchased on consignment through Ford or DCX. Plaintiff also asserts that it has additional remedies under the MSRCA, which entitles it to an additional $100,000, attorney fees, and judgment interest.

On January 25, 2007, Defendant counterclaimed against Plaintiff, requesting the Court direct Plaintiff to execute the Written Mutual Release provision of the settlement agreement, and declare that the "gross sales price" is solely measured by the "price of the base steel sold."

Both parties moved for summary judgment.

## II. ANALYSIS

### A. Summary Judgment Standard

Under Fed. R. Civ. P. 56(b), a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the

6

existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*. In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. Fed. R. Civ. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment). "'[C]onclusory' allegations unsupported by 'specific' evidence will be insufficient to establish a

genuine issue of fact." *Id.* (citations omitted); *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 902 (1990).

B.  **Validity of the Settlement Agreement**

"Before enforcing a settlement, a district court must conclude that agreement has been reached on all material terms." *Re/Max Int'l, Inc. v. Realty One*, Inc., 271 F.3d 633, 645-46 (6th Cir. 2001) (citation omitted). When facts material to an agreement are disputed, an evidentiary hearing must be held. *Id*. at 646. "However, no evidentiary hearing is required where the agreement is clear and unambiguous and no issue of fact is present." *Id*. (citation omitted).[2] "The existence of a valid agreement is not diminished by the fact that the parties have yet to memorialize the agreement. When parties have agreed on the essential terms of a settlement, and all that remains is to memorialize the agreement in writing, the parties are bound by the terms of the oral agreement. *Id*. (citations omitted). A settlement agreement depends upon objective, not subjective, manifestation of intent. *Therma-Scan, Inc. v. Thermoscan, Inc.*, 217 F.3d 414, 420 (6th Cir. 2000). "Once concluded, a settlement agreement is as binding, conclusive, and final as if it had been incorporated into a final judgment." *Re/Max,* 271 F.3d at 650; *Bosley v. 21 WFMJ Television, Inc.*, No. 06-3091, 2007 WL 2050655, *3 (6th Cir. July 13, 2007) (unpublished).

Under Michigan law, which the parties have agreed governs the instant dispute, "[a]n agreement to settle a pending lawsuit is a contract and is to be governed by the legal principles applicable to the construction and interpretation of contracts." *Kloian v. Domino's Pizza L.L.C.*,

---

[2] Neither party has requested an evidentiary hearing for the purposes of Plaintiff's motion. *See Michigan Regional Council of Carpenters v. New Century Bancorp, Inc.*, 99 Fed. Appx. 15, 20-21 n. 4 (6th Cir. Apr. 8, 2004) (unpublished) (holding that a party must request an evidentiary hearing, or the issue is waived). The Court finds that the summary judgment record provides a sufficient basis to render a decision in the instant case.

8

273 Mich. App. 449, 452 (2006). "The primary goal of contract interpretation is to honor the intent of the parties." *Old Kent Bank v. Sobczak,* 243 Mich. App. 57, 63 (2000). This entails a reading of the contract as a whole and an application of its clear language. *Id.* "If the provision is clear and unambiguous, the terms are to be taken and understood in their plain, ordinary, and popular sense." *Michigan Mut. Ins. Co. v. Dowell,* 204 Mich. App. 81, 87 (1994). "Courts are governed by what the parties said and did, and not merely by their unexpressed subjective intent." *Fletcher v. Bd. of Educ. of Sch. Dist. Fractional No. 5*, 323 Mich. 343, 348 (1948).

Plaintiff's essential position is that whether Ford's payments to Defendant for the increased price of steel was "in the form of a surcharge, quarterly, monthly, or some other form of payment, those additional were additional gross sales measured by the 'price of the base steel wheel sold.' Whether or not Defendant made additional profits on the additional monies paid by Chrysler (for which commissions were, in fact, paid to [Plaintiff] or additional profits on the wheels sold to Ford (upon which [Plaintiff] was not paid a commission is irrelevant." (Pl. Resp. 4). Plaintiff asserts that if Defendant intended to exclude the 1% surcharge from the agreed-upon commission payments, it should have insisted on such an arrangement at the settlement.

Defendant takes the opposite position, contending that: (1) it would never have agreed to pay a commission on a "dollar for dollar payment for the increased price of steel [since] it would have made no business sense to include this amount"; (2) Defendant raised the Ford surcharge issue with Judge Cleland who indicated that the steel surcharge was not commissionable under the settlement; and (3) the fact that DCX included the compensation for the increased steel price in the contract highlights that the parties intended to treat the Ford surcharge issue in a different manner.

9

Alternatively, Defendant argues that there was no "meeting of the minds" on the meaning of the term "gross sales," relying upon the Sixth Circuit decision in *Therma-Scan*.

The Court finds that the contract language is clear and unambiguous on its face. The plain and ordinary meaning of the term "gross sales" is the "[t]otal sales (esp. in retail) before deductions for returns and allowances." *See, e.g.*, Black's Law Dictionary (8th Ed. 2004). The payments by Ford to Defendant in compensation for the steel price increase is clearly part of the "gross sales" of the steel wheels, regardless of the method by which Ford chose to pay Defendant. The fact that Ford decided that it was in its interest to pay Defendant via a lump sum to cover the increased steel expenses, rather than increase the contract price, does not change the fact that those payments were part of the gross sales of the steel wheels to Ford.

Defendant admits that if the payment of the steel price increase had been included in the underlying contract, the contract price would be subject to Plaintiff's 1% commission. Defendant's position on the steel surcharge issue not only "puts form over substance," but also thoroughly undercuts its argument that it would not have accepted a deal where it would have to pay a "dollar for dollar payment of the increased price of steel." From the get-go, DCX included the steel price increase in its contract price. In 2007, Ford agreed to include the increased price of steel in its contract price. Defendant admits that under the DCX and 2007 Ford arrangements, the included steel price increase has formed a portion of the basis of the "gross sales" of the base steel wheel.

Defendant's further contention that if Plaintiff had wanted to include the steel surcharge payments in the "gross sales," Plaintiff would have attempted to include it in the settlement

agreement is meritless – the plain language of the settlement agreement does not apply the term "gross sales" differently for Ford or DCX.[3]

Defendant next offers extrinsic evidence to demonstrate that it had clarified the steel surcharge issue with Judge Cleland. Defendant's sales manager testified that Judge Cleland told him that the steel surcharge would not be commissionable, since the surcharge was not included in the "piece price." (Def. Br. Ex. 13, Dorsey Dep. 30-31, 35-36).

> The parol evidence rule may be summarized as follows: "[p]arol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." This rule recognizes that in "[b]ack of nearly every written instrument lies a parol agreement, merged therein." "The practical justification for the rule lies in the stability that it gives to written contracts; for otherwise either party might avoid his obligation by testifying that a contemporaneous oral agreement released him from the duties that he had simultaneously assumed in writing." In other words, the parol evidence rule addresses the fact that "disappointed parties will have a great incentive to describe circumstances in ways that escape the explicit terms of their contracts."

*UAW-GM Human Res. Ctr v. KSL Recreation Corp.*, 228 Mich. App. 486, 492 (1998) (internal citations omitted).

Defendant's proffered evidence constitutes impermissible parol evidence. The settlement agreement unambiguously states that the commission was to be calculated on the "gross sales price" of the base steel wheel. If Defendant had wished to exclude Ford's steel surcharge payment from the commonly-understood meaning of "gross sales price," the agreement does not reflect that understanding.

---

[3] Defendant contends that the parties themselves defined "gross sales," and that the parties' definition controls over the "plain and ordinary meaning." There is no indication that the parties' uniquely defined "gross sales" in this particular context. If Defendant wished the vary the meaning of the term "gross sales" as it applied to Ford, Defendant should have insisted on that term being included in the settlement agreement.

Finally, Defendant contends in the alternative that there was no "meeting of the minds" on the settlement term at issue.

The Court does not find that *Therma-Scan* provides an appropriate analogue for the instant situation. In *Therma-Scan*, the parties agreed in open court to settle a lawsuit involving alleged trademark infringement. 217 F.3d at 416. The district court put the parties' agreement on the record, but used "inherently incompatible" terms in "successive sentences." *Id*. at 420. Although neither of the parties objected to the district court's inconsistent outline of the settlement terms, the subsequent settlement negotiations "ma[de] clear that each [party] heard only what it wanted to hear." *Id*. The Sixth Circuit further looked to the settlement negotiations in observing that the parties' "reasonable differences in interpretation manifested themselves in heated debate during the drafting process, a situation that highlights the disagreement between the parties and the obvious materiality of the disputed term." *Id*.

The Court finds that this is not the situation in the instant case. Here, Judge Cleland's settlement memorandum did not contain any such patent inconsistency on the face of the document. As noted above, the plain and ordinary meaning of "gross sales" includes the total sales before deductions and allowances. If Defendant's intention had been to exempt the steel surcharge from the ambit of the phrase "gross sales price," Defendant should have insisted that the settlement agreement state that the commission payments to Plaintiff would be based on the "contract price," or some other specific provision.

Moreover, Defendant has admitted that if the compensation had been included in the contract price, rather than as a separate payment, then it would have paid to Plaintiff the commission on that contract price amount. Again, the Court finds that this argument elevates

form over substance; and Defendant has provided no permissible reason for the Court to deviate from the plain and ordinary understanding of the term "gross sales." Ford's steel surcharge formed a basis for Defendant's gross sales, regardless of the technical manner by which it was paid.

For the foregoing reasons the Court GRANTS Plaintiff's motion on its breach of contract claim, and DENIES Defendant's motion.

### C. Applicability of the Michigan Sales Representative Commissions Act

Plaintiff argues that the parties' "original consulting agreement as modified and later affirmed by the parties in the Cleland Settlement Memo constituted a contract for the payment of commissions as a result of orders solicited by Plaintiff." (Pl. Resp. 6). Therefore, per Plaintiff, it is entitled to recovery under the MSRCA.

The MSRCA provides in relevant part:

(1) As used in this section:

    (a) "Commission" means compensation accruing to a sales representative for payment by a principal, the rate of which is expressed as a percentage of the amount of orders or sales or as a percentage of the dollar amount of profits.

. . . .

    (c) "Prevailing party" means a party who wins on all the allegations of the complaint or on all of the responses to the complaint.

    (d) "Principal" means a person that does either of the following:

        (i) Manufactures, produces, imports, sells, or distributes a product in this state.

        (ii) Contracts with a sales representative to solicit orders for or sell a product in this state.

(e) "Sales representative" means a person who contracts with or is employed by a principal for the solicitation of orders or sale of goods and is paid, in whole or in part, by commission. Sales representative does not include a person who places an order or sale for a product on his or her own account for resale by that sales representative.

(2) The terms of the contract between the principal and sales representative shall determine when a commission becomes due.

. . . .

(4) All commissions that are due at the time of termination of a contract between a sales representative and principal shall be paid within 45 days after the date of termination. Commissions that become due after the termination date shall be paid within 45 days after the date on which the commission became due.

(5) A principal who fails to comply with this section is liable to the sales representative for both of the following:

(a) Actual damages caused by the failure to pay the commissions when due.

(b) If the principal is found to have intentionally failed to pay the commission when due, an amount equal to 2 times the amount of commissions due but not paid as required by this section or $100,000.00, whichever is less.

(6) If a sales representative brings a cause of action pursuant to this section, the court shall award to the prevailing party reasonable attorney fees and court costs.

. . . .

(8) A provision in a contract between a principal and a sales representative purporting to waive any right under this section is void.

Mich. Comp. Laws § 600.2961.

Michigan courts have explained the purpose of the MSRCA:

The [M]SRCA was enacted in 1992 to provide special protection to sales representatives, with the Legislature's expressed public policy to provide significant protections for a salesperson to collect his or her commissions. The legislative history reveals that this law is an attempt by Michigan lawmakers to compensate

sales agents for goodwill and other assets lost that would be difficult to quantify in a dispute. Thus, rather than requiring the harmed agents to resort to costly litigation to provide the detailed accounting necessary to ascertain all relevant damages, the legislature simply chose to assess those additional damages by requiring a principal who intentionally fails to pay commissions due to remit two times that amount to the agent.

*Linsell v. Applied Handling, Inc.*, 266 Mich. App. 1, 14 (2005) (internal citations omitted).

In order for a plaintiff to recover under the "double damages" provision under § 600.2961(b)(5), a plaintiff must also show that the defendant "intentionally" failed to pay the required commissions:

> The clear language of the statute evinces no textual intent to create a good faith defense to the double damages provision. . . .
>
> [I]f a principal deliberately fails to pay a commission when due, it is liable for double damages under the statute, even if the principal did not believe, reasonably or otherwise, that the commission was owed. There is no textual indication that a principal's good faith belief is relevant in making the determination that double damages are payable under the statute.
>
> . . . .
>
> Under the language of the statute, it appears that the only cognizable defense to a double-damages claim is if the failure to pay the commission were based on inadvertence or oversight.

*In re Certified Question from the United States Court of Appeals for the Sixth Circuit*, 468 Mich. 109, 113-14, 118 (2003) (footnote omitted).[4]

In addition to "actual damages" under § 600.2961(b)(5)(a), a successful plaintiff can recover "a single award of double the amount of compensation due but unpaid or $100,000, whichever is less." *Linsell*, 266 Mich. App. at 20-21.

Defendant responds that the MSRCA has no applicability to Plaintiff's instant breach of

---

[4] Defendant does not contend that the failure to pay the commission was based on "inadvertence or oversight."

15

settlement action. Defendant contends: (1) that the settlement "is not an agreement by which [Defendant] has contracted with [Plaintiff] to represent its interests in the sales of products"; (2) the parties are neither "principals" or "sales representatives" under the MSRCA; (3) the application of the MSRCA to settlement agreement does not further the purpose of the statute; and (4) Defendant has done no work on Plaintiff's behalf since the settlement conference in March 2006.

There is no dispute that Plaintiff and Defendant enjoyed a sales representative/principal relationship in the underlying lawsuit. On June 5, 1998, Plaintiff and Defendant entered into the consulting agreement, whereby Plaintiff would assist in Defendant's sales and marketing efforts of aluminum and steel wheels to automobile manufacturers. The original agreement specified that Defendant would pay Plaintiff $4,000 per month; but the agreement specified that further fees would be "in such amount as Manufacturer and Consultant agree." *Converge*, 2005 WL 3434799, at *5. The parties then amended the contract in 2000 to include Ford DCX under the arrangement. This Court held that this provision in the contract was an "agreement to agree," and dismissed Plaintiff's breach of contract claim. *Id*.

In the underlying litigation, this Court recognized that the parties were contemplating entering into commission agreement to satisfy the "agreement to agree" provision in the original contract:

> The entire essence of this consulting agreement anticipated the fruition of these contacts into contracts. In addition, Defendant included in its exhibits attached to its motion an e-mail from Dave Gonda and Dave Fisher, Plaintiff's principals, in which they explicitly state "[a]s you may recall, our contract calls for a separate agreement to be established once a resulting production order is placed, and "[w]e will need to establish this additional consulting or commission agreement." An e-mail from Mr. Okamoto, written to Dave Gonda, confirms the parties understanding with respect to the payment of commissions:

1. Products we will pay commission

   As advised in the previous mails, commission payable should be on wheels as follows:

   Ford: Wheels for P221 and E285 (Ford Australia) programs [Chrysler]: Wheels for "LX" and "RS" programs

   Any other programs for Ford & [Chrysler]: Only on programs as a result of contacts made by Converge with Topy's prior consent.

2. Commission rate: 0.5% on sales for the above products as you agreed per your e-mail of 5/22/03. Commission will be payable to Converge upon receipt of payment from Ford or [Chrysler].

. . . .

4. The reason why we entered into the Consultant Agreement in June 1998 was that we understood it will take a couple of years to generate some businesses and we wanted to support some of your expenses until you start receiving commissions. Therefore, we no longer have the intention to keep the Consultant Agreement upon entering a Sales Rep. Agreement.

*Id.* (internal citations omitted)

Thus, it is clear that the parties were contemplating entering into a sales representative commission agreement before the initiation of the underlying lawsuit. This Court subsequently held in the underlying case that Plaintiff could proceed on a quantum meruit theory of recovery for work performed on behalf of Defendant.

The parties then negotiated a settlement agreement which explicitly stated that Defendant would pay past-due and prospective commissions on Defendant's sales of wheels to Ford and DCX. The agreement expressly created an obligation on the part of Defendant to pay commissions to Plaintiff: (1) by June 9, 2006 for "past due" commissions from 2003 to March 9, 2006; and (2) within thirty (30) days of payments from Ford and DCX for sales until 2010. The

clear terms of the settlement agreement fall under the ambit of the MSRCA.

Defendant essentially contends that the settlement agreement itself does not create an ongoing principal/sales agent relationship. The Court does not read the scope of the MSRCA so narrowly. The statute indicates that "[t]he terms of the contract between the principal and sales representative shall determine when a commission becomes due." Mich. Comp. Laws § 600.2961(2). Here, the central dispute between the parties has focused upon the amount of commissions payable to Plaintiff. In the settlement agreement, the parties agreed to specific terms on the commission rates and timetables for both past and future sales to Ford and DCX, resulting from Plaintiff's past solicitation work. This commission payment arrangement clearly falls under the MSRCA.

Therefore, the Court GRANTS summary judgment to Plaintiff on its MSRCA claim, and DENIES summary judgment to Defendant. Under the statute, Defendant shall pay to Plaintiff: (1) actual damages; (2) double the amount of commissions owed, or $100,000, whichever is less; and (3) reasonable attorney fees and court costs.

### III.     CONCLUSION

For the foregoing reasons, the Court:

(1)     **GRANTS** Plaintiff's Motion for Summary Judgment (Doc. No. 20); and

(2)     **DENIES** Defendant's Motion for Summary Judgment (Doc. No. 23).

**SO ORDERED**.


                                        s/Paul D. Borman
                                        PAUL D. BORMAN

UNITED STATES DISTRICT JUDGE

Dated: September 28, 2007

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on September 28, 2007.

                                              s/Denise Goodine
                                              Case Manager